Memorandum of Decision
On October 6, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Derrick G. and Aida L. to their minor son, Derrick G.[2] Trial took place in this court on June 27, 28, and 29, 2000. For the reasons stated below, this court now grants the petition.
THE FACTS
The court finds the following facts and credits the following evidence.
A. The Father
The father was thirty-five years old at the time of trial. He dropped out of high school but later obtained a GED. He consumed alcohol regularly between 1979 and 1990. From 1987 to 1989, the father freebased with cocaine. The father is skilled in cabinet work and blueprints and has a substantial work history.
In 1995, the father began a relationship with Aida L. From this relationship, Derrick was born on October 17, 1996. Derrick remained in the hospital for approximately three weeks because he was born drug-addicted. He experienced a difficult withdrawal. Because the mother also tested positive for several illicit substances, Derrick went home with the father. The parents signed a service agreement with DCF on October 31, 1996.
The Visiting Nurses Association saw the father and Derrick on several occasions in November, 1996 and reported that the father was very CT Page 10549 involved with Derrick and that Derrick was doing well physically. The father was less compliant in keeping scheduled home and office appointments with a parenting agency known as ECAR. On November 21, 1996, the social worker for ECAR, Astrid Reyes, filed a report of abuse and neglect with DCF.[3] The father also failed several times to make or keep appointments with DCF for home visits. When DCF did see the father and son together during the initial months of the case, however, the baby was generally neat and clean and the father had all necessary supplies.
DCF filed a neglect petition on January 16, 1997 based on the father's lack of cooperation with ECAR and the mother's failure to complete substance abuse treatment. The parents lived together during this time period except when the mother was in a drug treatment program. Derrick missed five well care medical appointments between November, 1996 and March, 1997, and was one month delayed in getting immunizations. Throughout the remainder of 1997, the parents occasionally failed to keep appointments with DCF. When DCF did see Derrick, however, he again appeared neat, clean, and well cared for.
In September, 1997, the father was arrested and convicted of having a weapon in a motor vehicle. He received a suspended sentence of eighteen months and was placed on probation for two years. The court adjudicated Derrick neglected on October 8, 1997, ordered that the child remain with the father for nine months under DCF protective supervision, and imposed expectations. Among the expectations were the requirements that the father keep DCF apprized of any changes in address, participate in a drug assessment and follow recommendations, refrain from substance abuse, and have no further involvement with the criminal justice system.
Derrick missed four more medical appointments between September, 1997 and January, 1998. Late in December, 1997, the father was arrested and detained for approximately a week for allegedly making comments that he would kill his son if he did not get his most recent benefit check from the Department of Social Services. The charges were eventually dropped.[4] In January, 1998, the father moved without informing DCF of his change of address. DCF found his new apartment to be clean but sparingly furnished with a minimal amount of food. DCF obtained some furniture and food for the new apartment. The father went back to jail in February, 1998, for approximately a month for failure to make support payments.[5]
On February 2, 1998, DCF moved to modify the disposition to commitment based on the father's arrest, his failure to obtain drug evaluations, the mother's failure to obtain recommended substance abuse treatment, and the failure of both parents to keep their whereabouts known to DCF. With regard to the father's substance abuse, DCF had evidence that the father CT Page 10550 had provided two dirty urines through his criminal probation and that he smelled of alcohol on several occasions. On April 1, 1998, the court granted the motion and committed Derrick to DCF custody. The parents did not attend the court hearing.
On April 2, the father was arrested for sale and possession of heroin. The father was detained in jail until approximately May 13, 1998. During this time he was convicted of failure to appear in court, stemming from prior motor vehicle charges, and served a twenty-one day jail sentence. The father attended a visit with Derrick at the DCF office on May 15, which went well, but missed the next several scheduled visits.
On June 17, 1998, the father was arrested for fourth degree larceny and detained in jail. In July and August, 1998, the father was sentenced to a net effective term of five years suspended after two years and three years of probation for sale of narcotics, fourth degree larceny, and violation of probation.
The father did not contact DCF from prison until January 12, 1999.[6]
At that time he left a phone message to call his prison counselor concerning the case. On February 22, 1999, the father's attorney followed up with a letter to DCF requesting visitation. See note 6 supra. At no time did the father forward any cards or letters for Derrick from the prison.
As of June 12, 1998, DCF had assigned Astrid Reyes, who had previously worked with the family through ECAR, to be the new DCF social worker on the case. Reyes knew at the time that the goal of the case was reunification. She had received information shortly after taking the case that the father was incarcerated. Nevertheless, Reyes did not attempt to locate the father. She reasoned at the time that the court expectations required the father to contact DCF. She admitted at trial that it would have been reasonable to ascertain the whereabouts of the father and that the Department of Corrections was one of the first places she should have looked.
In response to counsel's February 22 letter requesting visitation, Reyes attempted, without success, to contact the father's prison counselor. At a court hearing in March, 1999, however, DCF opposed granting the father visitation because he had not contacted them until January and because of the comments he had allegedly made to the Department of Social Services in late 1997. At the next court hearing in July, 1999, DCF agreed to visitation. Once again, Reyes was unable to get through to the prison.
In early November, 1999, DCF denied the father's request to have a new CT Page 10551 social worker assigned to the case. A visit between Derrick and his father finally took place at the courthouse on November 22, 1999. The visit went well and Derrick was very friendly with his father. The next prison visit, which also went well, took place on December 30, 1999.
In prison, the father completed an anger management program and the "Tier 2" substance abuse program. On January 28, 2000, the father was released to a halfway house, where he remained for three months. In February, 2000, DCF transferred the case to a new social worker, Laszlo Urszenyi. The father asked for continued visitation with Derrick and DCF a greed to twice monthly visits.
The father attended the first visit on March 7, 2000 and it went well. Derrick called the father "Daddy." The father canceled the next visit at the last minute because of a conflict with his schedule for a job he had just obtained. Even though Derrick normally goes to bed at 8:00 p.m. in his foster home, DCF scheduled the next visit for 6:00 p.m. on April 7, 2000 to accommodate the father's new work schedule. The father arrived around 7:00 p.m.
The father saw Derrick at a court-ordered evaluation on April 14, 2000. Derrick recognized his father immediately, called him "Daddy," and interacted well. The evaluator concluded that there was a strong psychological bond between Derrick and his father.[7]
Between mid-March and mid-April, 2000, the father did not attend any AA or NA meetings at the halfway house. On April 16, 2000, the father had a small amount of beer, in violation of the terms of his release. He returned to prison for twenty-eight days. While in prison the father called Urszenyi to inform him of his whereabouts and to state that he did not want Derrick to see him in prison but that he would request visitation when he was released. The father was released from in May. He resumed working on his job and obtained a second job. The father called DCF and request visitation. The father missed two out of the next three scheduled visits.
B. The Mother
The mother, Aida L., was twenty-eight years old at the time of trial. She has two daughters from a prior relationship who have resided with their maternal grandmother since 1996. The mother has a history of substance abuse, principally heroin use, starting in her teenage years. In 1991, the mother was convicted of sale of narcotics and placed on probation. In 1993, the mother violated probation and received a sixteen month prison sentence. CT Page 10552
During her pregnancy with Derrick, the mother used. marijuana and opiates and made only two prenatal visits to the doctor. The mother tested positive for opiates, methadone and cannabanoids at the time of Derrick's drug-addicted birth. Between October, 1996 and August, 1998, the mother entered five different drug treatment programs, mostly as a result of DCF referrals and recommendations. The mother failed to complete any of these programs and tested positive for drugs on several occasions. In December, 1998, the mother entered a "methadone program. As of February, 1999, the program reported that the mother had tested positive for opiates, marijuana, and cocaine and that the mother had not attended individual or group counseling.
The mother stayed in Worcester, Massachusetts, away from Derrick and the father, for a period of time during Derrick's infancy. The mother returned in early 1997 and, in May, 1997, the DCF case worker met with the mother at home with Derrick. As discussed, the mother and father were not readily available for other home visits during this time period. In September, 1997, when the father was arrested for weapon in a motor vehicle, the mother was arrested for prostitution and placed on probation. Over this time period, the mother lived in a number of different locations and did not hold a job.
The mother attended two out of the first three scheduled visits with Derrick after he went into foster care in April, 1998. When the father went to jail in June, 1998, the mother stated that her relationship with him was over. DCF scheduled separate weekly visitation for the mother. Out of twenty-three visits scheduled between June, 1998 and April, 1999, the mother attended eight in their entirety, was late for four others, missed two because of attendance at treatment, and missed nine others without excuse. She arrived intoxicated or under the influence for one visit and wanted to leave early or did not seem interested at other visits. Between January and March, 1999, the mother attended only one complete visit and arrived late for one other.
On April 12, 1999, the mother was arrested for assault on a police officer. In the summer of 1999, the mother was regularly using heroin and cocaine. On July 23, 1999, the "mother was arrested for possession of narcotics. On October 20, 1999, the mother was convicted of possession of narcotics, assault on a police officer, failure to appear in court, and violation of the probation she had received in 1997 for prostitution. The mother received a fifteen month prison sentence. She remains incarcerated. In prison, the mother has completed the Tier 2 drug program and attended school, but also has been disciplined for making verbal threats to another inmate.
The mother requested visitation with Derrick at the prison on April 15 CT Page 10553 and July 27, 1999.[8] Initially, the mother had visits there in September, 1999 and January, 2000. More frequent visits did not occur because social worker Reyes took the position that an inmate had "to call every month to renew a request for monthly visitation. In addition, Reyes had difficulty transporting Derrick to prison because he would act out on the long car ride there and Reyes was unable to obtain additional help from DCF.[9]
The mother sent Derrick birthday and Christmas presents in October and December, 1999. When Urszenyi took over the case in March, 2000, DCF decided to provide the mother with monthly visits with Derrick at the prison. The visits have gone well although there is little physical or emotional interaction between Derrick and his mother.
C. The Minor Child
Derrick has been with his current foster mother since May, 1998. He is very attached to her and calls her "Mommy." Derrick originally presented behavior problems and showed speech delays, but he has received services from Birth to Three and is now on target developmentally. He is an active, friendly boy. The foster mother, who did not testify in court, is interested in adopting Derrick.[10]
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with commitment extension "hearings and permanency planning for committed children] that such efforts are not appropriate." General Statutes § 17a-112(c)(1).
1. Prior Reasonable Efforts Findings
At the first extension hearing in this case on March 30, 1999, the court deferred a finding on reunification efforts. After the next hearing on July 27, 1999, the court signed an order that reads as follows:
It . . . IS NOT appropriate to continue to make reasonable efforts to reunify the child/youth with the CT Page 10554 above-named respondent(s).
 The Commissioner of the Department of Children and Families shall continue further efforts for the safe reunification of the child/youth with the Respondent(s) for the next six (6) months, subject to the services and steps enumerated in the attached Specific Steps which are made part of this Order and incorporated by reference.
(Emphasis in original.) The clerk's memorandum of hearing for that day contains the notation "no finding on reunification."
These contradictory findings do not clearly and convincingly establish that the court made the requisite finding that reunification efforts are not appropriate. At best, this record reveals the court's decision to be that DCF should continue to make reasonable efforts for six additional months which, in this case, would be through January 27, 2000. After that date, there is no finding concerning continuing reunification efforts. Accordingly, the statutory pertaining to prior court findings is not available and DCF retained the burden of proving reasonable efforts in this trial.
2. Reasonable Efforts Analysis
The court finds that DCF made reasonable efforts to reunify the mother but not the father. DCF did make reasonable efforts to reunify both parents before they each went to prison. DCF worked with the Visiting Nurses Association and ECAR, provided food and furniture, referred the parents to drug evaluations and treatment, and, after Derrick was committed, arranged for visitation.
DCF's efforts when the mother first went to prison in April, 1999 were hardly exemplary. Social worker Astrid Reyes responded to the mother's April 15 request for visitation with bureaucratic indifference. See note 9 supra. As a practical matter, however, the mother soon thereafter made bail and the visit could have not taken place at the prison anyway.
Reyes' response to the mother's July, 1999 request for visitation was also lethargic. DCF has cited no authority, and the court knows of none, for Reyes's contention that an inmate is required to call every month to renew a request for monthly visitation. Further, even if Reyes did have difficulty transporting Derrick by herself in a car, DCF supervisors should have provided different or additional personnel to handle the transportation. It is of no small consequence that, once Urszenyi became the case worker, DCF was able to transport Derrick to the women's prison CT Page 10555 for monthly visits without incident. On the other hand, once DCF filed for termination on October 6, 1999, it had less of an obligation to attempt to reunite the biological family. Viewing the matter in its entirety, the court concludes that, while DCF could have been more helpful to the mother, it made reasonable efforts to reunite her with Derrick.
The father's case calls for a different finding. When Derrick was committed on April 1, 1998, the goal of the case was reunification. Given that goal, there is no excuse for Reyes's failure to find the father-in the prison system after his incarceration began on June 17, 1998 and offer him the opportunity to visit with Derrick. Reyes's reliance on court expectations requiring the father to notify DCF of his whereabouts may be relevant to the adjudicatory grounds of abandonment and failure to rehabilitate, but DCF cannot discharge its own statutory responsibility of making "reasonable efforts to locate the parent and to reunify the child with the parent" by cavalierly waiting for the parents to call first. Further, Reyes had received information shortly after taking the case that the father was incarcerated. And, given the father's previous problems with the law and the very nature of her business, in which a fair percentage of parents in DCF cases are in jail or prison, Reyes should have suspected that the father was incarcerated. Reyes ultimately admitted at trial that it would have been reasonable for her to ascertain the whereabouts of the father and that the Department of Corrections was one of the first places she should have looked.
When the father called from prison in January, 1999, and his attorney followed up with a specific request for visitation in February, Reyes stonewalled. She, along with her supervisors, opposed visitation on the ground that the father had not contacted them earlier and that the father had made threatening comments at the Department of Social Services in late 1997. Again, given the goal of reunification, it was DCF's obligation to call the father, not vice versa. Further, DCF had already offered the father visits in May and June, 1998, notwithstanding his allegedly threatening comments. Additionally, when a parent poses a moderate security threat, which may not even be the case here, DCF can always provide an appropriate level of supervision at visits. Thus DCF's reliance on the alleged threatening remarks was a purely pretextual reason for denying visitation.
Indeed, in July, 1999, DCF changed its position and agreed to visitation by the father. Even then, Reyes was somehow unable to reach the prison and set up a visit until November, 1999. If indeed Reyes was having difficulty reaching a responsible prison official, then this matter, given the one year that DCF had already delayed visitation, was one for DCF's supervisors to handle. Although there is no specific CT Page 10556 testimony on point, it is hard to believe that a call from a DCF supervisor to a prison warden would not produce results. The court finds that, due to an abdication of its mission to reunite families by both the case worker and her supervisors, DCF failed to make reasonable efforts to reunite the father with Derrick between June, 1998 and November, 1999.[11]
3. Inability or Unwillingness to Benefit
General Statutes § 17a-112(c)(1) provides that the failure of DCF to make reasonable efforts is not fatal to its case if "the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." In this case, the particular reunification efforts that DCF failed to provide the father consisted of monthly visits with Derrick at his prison between June, 1998 and November, 1999. There is no claim that DCF could have provided more frequent visits or a greater range of services while the father was in prison.
The court finds that the father was unable or unwilling to benefit from the missed monthly visits. The father had a good relationship with Derrick before he went to prison and, somewhat surprisingly, retained that relationship when visits resumed seventeen months later in November, 1999. The father and Derrick both have a friendly nature and still interact well together.
The father's difficulty is not his interaction with Derrick during visits but rather his other behaviors. Another fifteen one hour visits with Derrick at the prison would not likely have remedied this problem.[12] The father squandered every opportunity he had to establish his overall fitness as a parent. For all practical purposes, the father was Derrick's sole custodian when he came home from the hospital. The father did not meet this challenge. He missed appointments with ECAR, DCF, and Derrick's doctor, and was convicted of having a weapon in a motor vehicle, resulting in DCF filing for and the court making an adjudication of neglect. The father got another chance when the court kept Derrick with the father under protective supervision, but during this time period the father then went to jail twice, provided dirty urines to probation, missed more medical appointments, and moved without informing DCF. The court then modified the disposition to commitment, but the goal of the case remained reunification. The father responded the next day by getting arrested for sale of narcotics. In the next two months, he missed several visits with Derrick and was arrested again for larceny.
The father received a two year prison sentence for his crimes. The father, not DCF, bears the brunt of the responsibility for taking himself CT Page 10557 out of his son's life for these two years. It is true that the fifteen one hour prison visits that DCF should have provided would have had some value. But they are no substitute for the opportunity to have had longer, possibly unsupervised visits, for the father to maintain a household for his son, and for him to regain custody of his son. All of these opportunities would have been available had the father kept himself out of prison.
Even after his initial release from prison the father did not measure up to standards. He missed AA and NA meetings. He consumed alcohol in violation of his release and went back to prison. Upon his second release, he missed two of the next three scheduled visits with Derrick. The father, in short, has consistently put his own interests ahead of Derrick's. The court accordingly concludes that the father was unable or unwilling to benefit from the prison visits that DCF failed to provide him.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112(c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Because there were no amendments in this case, the adjudicatory date is October 6, 1999, the date of filing of the original petition. The petition alleges the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship against both parents. The court finds that DCF has proven the ground of failure to rehabilitate against both parents by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, CT Page 10558 fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
DCF's October, 1999 social study disserves the court by reporting that the father "has abandoned his son since May of 1998 by not inquiring about him or visiting him." This statement is at best half true. It is true only that in June, 1998, the father went to prison and that, as the court has found, the father did not contact DCF until January, 1999. This seven month hiatus, especially when coupled with the father's failure to send cards or letters to be read to Derrick, constitutes a temporary abandonment.
The father's incarceration is no defense. See In re Juvenile Appeal(Docket No. 10155), 187 Conn. 431, 443, 446 A.2d 808 (1982). A prisoner must "make use of available though limited resources for contact with a distant child." Id. Regardless of the fact that DCF did not meet its obligation to make reasonable efforts to locate and reunify the father during this period, the father had an independent moral obligation to maintain contact with his child. See In re Shane P., 58 Conn. App. 244,255-56, ___ A.2d ___ (2000). The father, for seven months, did not fulfill that obligation.
Beginning in January, 1999, however, and through the remainder of the adjudicatory period, the father made regular contact with DCF and requests to visit Derrick. As stated above, DCF's response was to delay and deny. It appears that the father's failure to make requests earlier stemmed from his dislocation in the prison system. On balance, the evidence does not clearly convincingly establish that the ground of abandonment against the father. The degree to which the father maintained a reasonable degree of interest in his son is nonetheless very relevant to the ground of failure to rehabilitate.
The facts are somewhat similar in the mother's case. DCF states in its October, 1999 social study that the mother "has abandoned her son since December of 1998 by not inquiring about him or visiting him." It reports elsewhere that since Derrick went into foster care in April, 1998, the mother "has attended a total of five complete visits with her son [and] . . . has not visited with her son, Derrick G since 12/98." These statements are simply not accurate. The facts are that the mother attended eleven, not five, complete visits with Derrick between April, 1998 and September, 1999, did visit with him three times (including once when she was late) after December, 1998 (and before October, 1999), and made requests from prison for visits in April and July, 1999. DCF's CT Page 10559 theory of abandonment is thus premised on misinformation.
Because the mother attended at least the majority of the visits, the court cannot say that The evidence clearly and convincingly establishes that she did not maintain a reasonable degree of concern in her son. The mother's visitation record, however, is not laudatory. It reveals her sputtering commitment to Derrick, her inability to keep appointments, and her continuing substance abuse. Here again, the court will take this evidence into account in considering the ground of failure to rehabilitate.
2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). No dispute exists that, on October 8, 1997, the court adjudicated Derrick to be neglected, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would-encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). The statute requires the court to "analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time.'" In reLuis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In reDanuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." Inre Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
DCF has presented a compelling case of failure to rehabilitate against both parents. The court has recited much of the case against the father in its earlier discussion of the element of reasonable efforts, which the court incorporates here. See pages 14-16 supra. In sum, the father's performance as a parent steadily deteriorated over the adjudicatory CT Page 10560 period, necessitating ever-increasing state involvement in Derrick's life. He did not fully cooperate with the DCF service agreement, thus justifying protective supervision. He did not comply with court-ordered expectations, thus requiring Derrick's commitment to DCF custody. Upon commitment, the father was convicted of serious crimes and sent to prison for two years. The father failed to contact DCF or Derrick for his first seven months in prison and at no point sent Derrick cards or letters.
Of special importance is the father's repeated involvement with the criminal justice system. The father received probation in September, 1997 for having a weapon in a motor vehicle. The father then proceeded to violate that probation on numerous occasions. He was arrested in December, 1997 on misdemeanor charges and detained in January, 1998 for nonsupport. In April, 1998, the father was arrested for sale of heroin and convicted of failure to appear in court stemming from an earlier motor vehicle arrest. No sooner was the father released from jail than he was arrested again, this time for fourth degree larceny. He was then convicted of sale of narcotics, fourth degree larceny, and violation of probation and sentenced to five years suspended after two and three years probation.
The father's repeated violation of his criminal probation parallels his repeated failure to comply with the various forms of parental probation that DCF and the court imposed on him between 1996 and 1998. The father received numerous chances, both to stay out of prison and retain or regain custody of his son, and squandered them all. It follows that during the adjudicatory period the father did not achieve "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(B)(1). Accordingly, DCF has proven failure to rehabilitate against the father.
The mother also failed to rehabilitate during the adjudicatory period. She could not conquer her drug addiction. She failed to complete five different drug programs and continued to use narcotics through the summer of 1999. Undoubtedly as a result, the mother repeatedly violated the criminal law and ultimately took herself out of her son's life by receiving a substantial prison sentence. Like the father, she received the benefit of probation but did not comply with it.
When not in prison, the mother lived in a number of different locations and did not hold a job. Part of the time during Derrick's infancy she estranged herself from him by living in Worcester. When she returned home, she did not fully cooperate with DCF home visits. After Derrick went into foster care, the mother's visitation record was poor. Her CT Page 10561 practice of missing visits without excuse, arriving late or intoxicated, or seeking to leave early revealed that Derrick was not very important to her. While she took more of an interest in Derrick when she went to prison, this fact is of less significance than the fact that, while there, she also behaved in an antisocial manner. This evidence clearly and convincingly establishes that DCF has proven the ground of failure to rehabilitate against the mother.
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that "relationship, so that despite its former existence it has now been completely displaced." In re JuvenileAppeal (Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
DCF did not introduce a psychological evaluation or other evidence directly addressing Derrick's feelings about his relationship with his mother during the adjudicatory period. While her inconsistent contact with him and her addiction to drugs suggests that the relationship was at best troubled, such proof does not suffice to establish the ground of no ongoing parent-child relationship. See In re Juvenile Appeal (Anonymous),177 Conn. 648, 670-71, 420 A.2d 875 (1979). In the father's case, the April, 2000 psychological evaluation established that there was still a strong psychological bond between father and son. To his credit, the current DCF worker concurred. Accordingly, DCF has failed to prove the ground of no ongoing relationship against either parent by clear and convincing evidence.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5. CT Page 10562
The best interest of Derrick G. warrants termination of his parent's rights. The mother is available to Derrick due to her prison sentence. When she returns to the community she will face the difficult challenge of remaining drug-free. She does not have a close relationship to Derrick.
The father has a better relationship with Derrick. He is a hard and skilled worker. But he has no track record for being able to work, maintain a relationship with Derrick, and obeying the rules of society at the same time. It is reasonably possible that the father will be able to stabilize his life completely in the future, but Derrick should not have to wait any longer for the father to prove himself.
Derrick, who will be four years old in October 2000, is attached to his foster mother. He has made good progress in the foster home. Although the foster mother did not testify, no dispute exists that she is committed to adoption. The best interest of Derrick favors termination of parental rights so that adoption will be legally possible. The foster mother, however, should give due consideration to appropriate visitation by the father so that Derrick can maintain a connection to his biological family. In general, this court is "not prepared to assume that the welfare of children is best served by a narrow definition of those whom [it] permit[s] to continue to manifest their deep concern for [their] child[ren]'s growth and development." Michaud v. Wawruck, 209 Conn. 407,415, 551 A.2d 738 (1988).
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes §17a-112(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168
(1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691,741 A.2d 873 (1999). a discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
As stated in the section on reunification, DCF made reasonable efforts to reunify the mother with Derrick. DCF made reasonable efforts to reunify the father before he went to prison but then, by failing to provide the father with visitation in prison between June 1998 and November 1999, did not fulfill its responsibilities. Ultimately, however, the father was unable and unwilling to benefit from the visitation he should have received. CT Page 10563
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, and particularly because DCF gave the parents two full years after the neglect adjudication to rehabilitate, the court finds that DCF offered the parents appropriate services and sufficient time to permit family reunification, in conformance with federal law.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. On October 8, 1997, the court entered the following expectations for the parents to meet in order to retain custody of Derrick: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF, (3) cooperate with DCF for home visits, (4) participate in a drug assessment and follow recommendations, (5) secure/maintain adequate housing and income, (6) no substance abuse, and (7) no further involvement with the criminal justice system. The parents' compliance with these expectations was generally poor. The father did maintain an adequate income when he was not in jail.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As discussed above, Derrick is bonded to his foster mother. He also has a psychological bond with his father. He does not view Aida L. as his mother.
5) The age of the child.
Derrick will be four years old on October 17, 2000.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not CT Page 10564 adjust their circumstances in time to make it in Derrick's best interest to return to their home. The mother's contact with Derrick has been inconsistent until recently. The father had custody of Derrick until April, 1998. Thereafter, the father's visitation record was also inconsistent, wholly aside from DCF's failure to provide visits for the father between June, 1998 and November, 1999.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petition. The Commissioner of DCF is appointed statutory parent for Derrick for the purpose of securing an adoptive family. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court